IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BRIAN CARL HUNT, | ) | CASE NO.  1:24-CV-01619-BMB |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | MAGISTRATE JUDGE |
| SECURITY, | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |

Plaintiff, Brian Hunt ("Plaintiff" or "Hunt"), challenges the final decision of Defendant, Leland Dudek,[1] Acting Commissioner of Social Security ("Commissioner"), denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I.  PROCEDURAL HISTORY

In August 2021, Hunt filed an application for SSI, alleging a disability onset date of January 31, 2017, and claiming he was disabled due to a tear on the back side of heart, several heart attacks, and eight broken bones in his right foot. (Transcript ("Tr.") 15, 61.)  The application was denied initially and upon reconsideration, and Hunt requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 15.)

---

[1] On February 19, 2025, Leland Dudek became the Acting Commissioner of Social Security.

1

On August 25, 2023, an ALJ held a hearing, during which Hunt, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.*) On October 27, 2023, the ALJ issued a written decision finding Hunt was not disabled. (*Id.* at 15-27.) The ALJ's decision became final on July 24, 2024, when the Appeals Council declined further review. (*Id.* at 1-6.)

On September 22, 2024, Hunt filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 8, 10, 12.) Hunt asserts the following assignments of error:

(1)    The ALJ erred when relying upon vocational expert testimony that conflicted with the RFC finding.

(2)    The ALJ erred in her evaluation of the medical opinions and prior administrative medical findings and in her evaluation of Plaintiff's subjective allegations. The ALJ failed to identify substantial evidence supporting the residual functional capacity finding.

(Doc. No. 8.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Hunt was born in December 1976 and was 46 years-old at the time of his administrative hearing (Tr. 15, 26), making him a "younger" person under Social Security regulations. *See* 20 C.F.R. § 416.963(c). He has at least a high school education. (Tr. 26.) He has past relevant work as a general laborer. (*Id.* at 41.)

### B.    Relevant Medical Evidence[2]

On November 10, 2019, Hunt went to the emergency room after falling down some stairs. (*Id.* at 249.) He reported hitting his head and that he thought he broke his right ankle. (*Id.*) On examination, treatment providers found the right ankle swollen and tender with fracture blisters. (*Id.* at 252.) X-rays

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

taken that day revealed "[m]inimally displaced comminuted fracture of the calcaneus with prominent bimalleolar soft tissue swelling." (*Id.* at 262.)

On November 15, 2019, Hunt saw Emily Exten, M.D., for his broken ankle. (*Id.* at 370.) Dr. Exten noted "significant fracture blisters" and commented that wound healing would be one of Hunt's greatest challenges. (*Id.*) On examination, Dr. Exten found "[s]ignificant swelling," ecchymosis, a large amount of blistering of the foot and ankle, tenderness to palpation throughout the foot and ankle, decreased range of motion of the foot and ankle, and decreased sensation. (*Id.* at 372.) Dr. Exten hoped to proceed non-operatively. (*Id.* at 370.) Dr. Exten ordered a CT scan, cleaned the wounds, and put Hunt in a splint. (*Id.*)

On November 22, 2019, Hunt saw Dr. Exten for follow up. (*Id.* at 373.) Dr. Exten noted Hunt would remain non-weightbearing and placed him in a boot. (*Id.*) Hunt had not yet undergone a CT scan. (*Id.*) On examination, Dr. Exten found decompressed skin blisters, tenderness to palpation of the calcaneus and over the blisters on the skin, and decreased range of motion. (*Id.* at 374.)

On November 27, 2019, Hunt saw Dr. Exten for follow up. (*Id.* at 375.) Dr. Exten noted they were still waiting on Hunt's CT scan. (*Id.* at 376.) Hunt presented with a new wound on his medial hindfoot, although he denied any increased pain. (*Id.*) On examination, Dr. Exten found mostly decompressed skin blisters, tenderness to palpation of the calcaneus and over the blisters on the skin, and decreased range of motion. (*Id.*) Dr. Exten debrided the wound where the skin had broken down over the medial hindfoot. (*Id.*)

On December 4, 2019, Hunt saw Dr. Exten for follow up. (*Id.* at 378.) On examination, Dr. Exten found tenderness to palpation, decreased range of motion, "several areas of decompressed blisters," and a "[v]ery small medial wound" that had "decreased in size significantly." (*Id.* at 379.) Dr. Exten debrided the wound again. (*Id.*) Dr. Exten noted Hunt's CT scan had been approved. (*Id.* at 378.)

3

A CT scan of the right foot taken on December 6, 2019 revealed comminuted fractures throughout the entire length of the calcaneus leading to a flattening of Boehler's angle to 0; intraarticular extension into the posterior subtalar joint as well as anteriorly into the articulation of the calcaneus with the cuboid; moderate disuse osteopenia; and nonspecific moderate edema of subcutaneous fat diffusely surrounding the lower extremity.  (*Id.* at 382.)

On December 18, 2019, Hunt saw Dr. Exten for follow up.  (*Id.* at 384.)  Dr. Exten noted Hunt would continue to be treated nonoperatively for two reasons:

> [Hunt] had significant fracture blisters and several wounds which greatly compromised the soft tissue envelope and led to him not being amenable to surgery early on.  However as that was healed his insurance company continued to delay his CT scan by not approving it.  This negatively impacted this patient's care.  I discussed with him that we will allow things to heal.  In the future he may need reconstructive osteotomies and fusions of the hindfoot related to this injury.  He understands.

(*Id.*)  On examination, Dr. Exten found tenderness to palpation throughout the heel, decreased range of motion, and healed blisters and wounds.  (*Id.* at 385.)

On February 13, 2020, Hunt went to the emergency room with complaints of chest pain.  (*Id.* at 284.)  Hunt complained of burning in his chest for the past week and that his left shoulder also hurt.  (*Id.*) He denied shortness of breath, diaphoresis, and nausea.  (*Id.*)  He admitted to using cocaine and heroin that week.  (*Id.*)  On examination, treatment providers found elevated troponins, non-specific EKG changes, and ST depression.  (*Id.* at 292.)  Hunt reported being noncompliant with his hyperlipidemia medication.  (*Id.* at 297.)  Treatment providers diagnosed Hunt with a non-ST elevated myocardial infarction.  (*Id.* at 292.)  Hunt underwent left heart catheterization and stent placement.  (*Id.* at 318.)  His ejection fraction was 35-40%.  (*Id.* at 302.)  On February 15, 2020, treatment providers found Hunt lethargic and minimally responsive, and his girlfriend was cyanotic and unresponsive.  (*Id.* at 316.) Treatment providers administered Narcan to Hunt and his girlfriend.  (*Id.*)  Later that day, Hunt left against medical advice.  (*Id.* at 318.)

4

On May 12, 2020, Hunt saw Dr. Exten for follow up after missing several follow up appointments since his December 18, 2019 appointment. (*Id.* at 386-87.) Hunt complained of right heel pain. (*Id.* at 387.) Dr. Exten noted Hunt was weightbearing as tolerated. (*Id.* at 386.) On examination, Dr. Exten found a mildly antalgic gait in regular footwear, mild tenderness to palpation at the plantar aspect of the heel, mild tenderness of the lateral aspect of the ankle and the peroneal tendons, decreased ankle dorsiflexion, and intact sensation. (*Id.* at 387.) Hunt was not in significant varus. (*Id.*) X-rays taken that day revealed interval healing of the right calcaneus fracture, deformity of the calcaneus status post fracture, and depression of the posterior facet. (*Id.*) Dr. Exten recommended Hunt wear a Tuli's heel cup and start physical therapy for subfibular impingement. (*Id.* at 386.)

On May 19, 2020, Hunt saw podiatrist Jeffrey Lynn for complaints of a painful and swollen right leg. (*Id.* at 390, 394.) On examination, Dr. Lynn found subungual debris of the nails bilaterally, pain to palpation of the right lower leg/ankle, pain in nails 1-5 bilaterally, and mild decrease in dorsiflexion of the first MPJ bilaterally, no limp, and normal heel off. (*Id.* at 391-92.) Hunt's diagnoses included localized edema, tinea unguium, and pain in the feet bilaterally. (*Id.* at 392.) Dr. Lynn debrided the toenails. (*Id.*)

On June 3, 2020, Hunt saw Dr. Lynn for follow up. (*Id.* at 395.) Hunt complained of continued pain and swelling in his right ankle/leg and continued instability issues. (*Id.*) On examination, Dr. Lynn found pain to palpation of the right ankle, STJ, and right peroneal tendon, as well as degenerative joint disease of the right ankle. (*Id.* at 396.) Dr. Lynn administered electrical stimulation, stretching, and therapeutic ultrasound. (*Id.* at 397.) Dr. Lynn wrapped the foot and ankle in a medicated, multi-layered compression dressing and placed Hunt in a hinged boot. (*Id.*) Dr. Lynn explained that the device was medically necessary because while Hunt could walk, he had weakness and deformity which required medical stability. (*Id.*)

On July 1, 2020, Hunt saw Dr. Lynn for follow up and reported the brace had reduced his pain and helped "significantly" with his instability. (*Id.* at 400.) On examination, Dr. Lynn found pain to palpation of the right ankle, STJ, and peroneal tendon, as well as degenerative joint disease of the right ankle. (*Id.* at 401.) Dr. Lynn administered electrical stimulation, stretching, and therapeutic ultrasound. (*Id.* at 402.) Dr. Lynn wrapped the foot and ankle in a medicated, multi-layered compression dressing. (*Id.*)

On December 19, 2021, Hunt underwent a consultative physical examination conducted by Casey Norris, D.O. (*Id.* at 437-44.) Hunt told Dr. Norris his disability stemmed from his right foot pain, back pain, chest pain, and shortness of breath. (*Id.* at 442.) Hunt reported wearing an ankle brace "24/7 for stability" and that he usually used a cane. (*Id.*) Hunt did not bring his cane to the examination because "he did not want to seem as if he were trying to fake it for disability." (*Id.*) He endorsed weakness and numbness in the right foot and ankle. (*Id.* at 443.) On examination, Dr. Norris found the ability to get on and off the examination table unassisted with difficulty, antalgic gait favoring the right foot, inability to walk heel to toe, on heels, or on toes, inability to hop or squat, positive straight leg raise test on the right, tenderness to palpation over the low back, right foot, and right ankle, and decreased range of motion in the right ankle. (*Id.*) Dr. Norris opined:

> This claimant should be able to walk for two to three hours out of an eight-hour day. The claimant could probably be on their feet for a combined total of three hours out of an eight-hour day. The claimant probably could carry less than 30 pounds frequently and more than 40 pounds on occasion. Other limitations in function include lifting, carrying, pushing, pulling, crawling, kneeling, crouching, climbing, stooping, and bending.

(*Id.* at 444.)

On January 12, 2022, Hunt underwent a myocardial perfusion multi spect study, which revealed the following abnormalities: a large fixed defect involving the entire inferior, interior, basal-mid inferospetal, and basal-mid inferoseptal walls with associated hypokinesis consistent with previous myocardial infarction; a small, moderate intensity, partially reversible defect consistent with reversible

6

myocardial ischemia; and a dilated left ventricle with segmental hypokinesis and severe left ventricular systolic dysfunction, post-stress LVEF 24%, and rest LVEF 38%.  (*Id.* at 453-54.)  Hunt had an overall high-risk study.  (*Id.* at 454.)

A March 2, 2022, echocardiogram revealed moderate reduction of heart function, an ejection fraction of 38%, and a mild enlargement of the aortic root. (*Id.* at 500.)  Viremkumar Patel, M.D., noted that Hunt "has been a no-show to 3 of his last scheduled dates for the heart cath.  I would really recommend that he consider the heart cath as we were concerned with LAD/anterior ischemia/CAD given his nuc results."  (*Id.*)

On March 23, 2022, Dr. Lynn certified that Hunt was to be non-weightbearing with crutches at all times.  (*Id.* at 511.)

On March 24, 2022, Dr. Lynn prescribed a knee scooter for Hunt due to right ankle fracture.  (*Id.*)

On June 22, 2022, Hunt saw Matthew Schirner, PA-C, for follow up of his closed displaced pilon fracture of right tibia with nonunion, post-operative pain, and status post ankle fusion.  (*Id.* at 512.)  Hunt was to be strictly non-weightbearing for 2-8 weeks and elevate his foot/ankle to heart level while at rest. (*Id.* at 515.)

On October 20, 2022, EMS brought Hunt to the emergency room for a drug overdose after Hunt snorted a Xanax.  (*Id.* at 543.)  Hunt's mother called 911 after becoming concerned and EMS administered Narcan.  (*Id.*)  Hunt denied chest pain, shortness of breath, and abdominal pain.  (*Id.*)  On examination, treatment providers found altered mental status, polysubstance abuse, cardiac arrythmia, and hypoxia, and admitted Hunt for treatment.  (*Id.* at 551.)  On October 21, 2022, treatment providers noted Hunt ambulated in the hallway with a steady gait and denied shortness of breath.  (*Id.* at 555.)  An ECG taken that same day revealed sinus rhythm with frequent PACs and PVCs, as well as an ejection fraction of 24%.  (*Id.* at 574.)  Dr. Patel thought the low ejection fraction may be related to Hunt's drug overdose.

7

(*Id.*)  Dr. Patel restarted Hunt's heart medications and stressed the importance of medication compliance. (*Id.*)

On February 7, 2023, Hunt saw Dr. Patel for follow up.  (*Id.* at 725.)  Dr. Patel noted the etiology of Hunt's drop in ejection fraction was unclear, although it was possible it was related to his drug overdose.  (*Id.*)  At Hunt's last visit, Dr. Patel had started Hunt on Entresto and scheduled him for the heart failure clinic. (*Id.* at 726.)  Dr. Patel noted Hunt had missed two appointments with the heart failure clinic.  (*Id.*)  Hunt told Dr. Hunt he was doing well and denied chest pain, shortness of breath, lower extremity swelling, orthopnea, and palpitations.  (*Id.*)  Hunt endorsed lightheadedness at times, especially with quick movements.  (*Id.*)  Dr. Patel recommended continued medications, lifestyle modifications, and cardiac rehabilitation.  (*Id.* at 729.)

A March 30, 2023, echocardiogram revealed an ejection fraction of 41%.  (*Id.* at 738.)

## C.    State Agency Reports

On January 12, 2022, Laverne Barnes, D.O., reviewed the file and opined that Hunt could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, and his ability to push and/or pull with the upper extremities and his left lower extremity was unlimited other than shown for lift and/or carry.  (*Id.* at 65-67.)  He could stand and/or walk for a total of two hours in an eight-hour workday because of his heart attacks and right foot fracture.  (*Id.* at 66.)  He could sit for about six hours in an eight-hour workday.  (*Id.*)  Hunt could occasionally push and/or pull with his right lower extremity.  (*Id.*)  Hunt could occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds.  (*Id.*)  He could occasionally balance and stoop.  (*Id.*)  He could frequently kneel, crouch, and crawl.  (*Id.*)  He must avoid concentrated exposure to temperature extremes, humidity, vibration, and fumes, odors, dusts, gases, poor ventilation, etc.  (*Id.*)  He must avoid even moderate exposure to hazards.  (*Id.*)

On September 1, 2022, on reconsideration, Gerald Kylop, M.D., affirmed Dr. Barnes' findings. (*Id.* at 74-76.)

### D.  Hearing Testimony

During the August 25, 2023 hearing, Hunt testified to the following:

- He holds a driver's license, and he drives.  (*Id.* at 42.)

- He has very slow breathing and he cannot do much.  (*Id.*)  He can't breathe after climbing stairs.  (*Id.*)  He mainly experiences shortness of breath.  (*Id.*)  He gets some chest pain, but it's not constant.  (*Id.*)  When he gets chest pains, he needs to sit down and take a break.  (*Id.*)  He gets fatigued easily.  (*Id.*)  He has had three heart attacks. (*Id.* at 43.)  He takes five heart medications.  (*Id.*)  If he lays flat on his back, his heart starts to race, and he gets short of breath.  (*Id.* at 44.)  The only time his heart starts to "get out of whack" is when he is doing some kind of activity, especially in the heat. (*Id.*)  His heart starts to race, and he gets short of breath.  (*Id.*)  He cannot do cardiac rehab because he cannot run on a treadmill or be on an elliptical because of his ankle. (*Id.* at 45.)

- His ankle is a "complete mess."  (*Id.* at 44.)  He uses a cane.  (*Id.*)  He cannot stand for more than 15 minutes.  (*Id.*)  He cannot sit for more than 20-25 minutes because the pain moves up.  (*Id.*)  He must stand and sway from foot to foot so he can keep his weight off the right ankle.  (*Id.*)  It's swollen all the time.  (*Id.*)  He underwent surgery to reconstruct the bottom of his foot with a bone graft and a titanium rod.  (*Id.* at 44-45.)  He wears a brace when he is going to be out walking.  (*Id.* at 45.)  He uses a cane to help when he is walking.  (*Id.* at 46.)  He uses an electric scooter at the grocery store because if he walks around for an hour when grocery shopping, he is "down for two days."  (*Id.*)  He also uses his cane to help him balance when he sways back and forth to keep the weight on his left side.  (*Id.* at 47.)

- He could lift 50 pounds at any one time.  (*Id.* at 48.)  He could lift 50 pounds about three to four times before he would be winded and need to take a break.  (*Id.*)  He tries to help with the yard work.  (*Id.*)  One time, he lifted five or six mulch bags out of the trunk and then needed to sit down.  (*Id.*)

- He stays with his grandmother, and she has the beginnings of dementia.  (*Id.*)  He tries to help her as much as he can.  (*Id.*)  She has people who come in to help her, but not 24 hours a day.  (*Id.*)  He does things around the house, like cooking, dishes, and laundry.  (*Id.* at 48-49.)  When he folds laundry, he can change positions, so he doesn't have to be winded.  (*Id.* at 49.)  He can do it at his own time and pace.  (*Id.*) There are not many dishes, so he can stand there and do them.  (*Id.*)  His biggest challenge is climbing stairs.  (*Id.*)  He can do it, but he tries to avoid it as much as he can.  (*Id.*)

The ALJ told the VE he was going to skip the assessment of past work.  (*Id.* at 41.)  The ALJ posed the following hypothetical question:

> [F]or the first hypothetical, please assume an individual the same age and education and [sic] the claimant.  This individual could perform light work as defined by the regulations.  However, the individual would be limited to standing and/or walking for two hours in an eight hour workday.  The individual can occasional [sic] push or pull with the right lower extremity.  The individual could never climb ladders, ropes or scaffolds, occasionally climb ramps and stairs, occasionally balance as that term is defined in the Dictionary of Occupational Titles, as well as occasionally stoop.  The individual could frequently kneel, crouch and crawl.  The individual must avoid concentrated exposure to extreme cold, extreme hot, humidity, avoid concentrated exposure to vibrations and atmospheric conditions, including fumes, odors, dusts, gases, poor ventilation and the individual would need to avoid exposure to all hazards, including unprotected heights, heavy machinery and commercial driving.  In light of these limitations, would there be jobs in the national economy that the individual could perform?  And if yes, please identify the jobs and numbers?

(*Id.* at 51.)

The VE testified this hypothetical would be sedentary rather than light work.  (*Id.*)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as addresser, table worker, and circuit board assembler.  (*Id.* at 52.)

The ALJ modified the hypothetical to change the exertional level to sedentary, limit the hypothetical individual to no climbing and occasional crouching, and add the use of a cane for assistance in ambulation.  (*Id.*)  The VE testified the previously identified jobs would remain.  (*Id.* at 52-53.)

The ALJ further modified the hypothetical to add that in addition to using a cane for walking, the hypothetical individual would need to use the cane for balance as well.  (*Id.* at 53.)  The VE testified as follows:

> Your Honor, the use of balance, again, those are sedentary work examples where the essential functions are performed in one postural position and so the use of the cane for balance is not going to impact those essential functions.  It's going to go to the off task, how much off task the individual has in changing his postural positions.  That sit/stand variance is not addressed in the DOT or the SCO, so it's going to be based on how much off task the

10

> individual is in this postural positions [sic] while performing those essential functions of those work examples that I gave.

(*Id.*)  The VE further testified the allowance for time off task would be 10% outside of scheduled breaks and the lunch period.  (*Id.*)

Hunt's attorney asked the VE whether, in the jobs identified, the individual is typically sitting eight hours a day doing their job.  (*Id.* at 55.)  The VE testified that was correct.  (*Id.*)  Hunt's attorney then asked, "So when the Judge was talking about the cane for balance and ambulation both, they would basically not – they would need some sort of sit/stand option at the workforce for it to become work preclusive? Am I correct on that?"  (*Id.*)  The VE testified:

> Well, the sit/stand variance is not addressed in the <u>DOT</u> or the <u>SCO</u>.  Based on my experience in the labor market, the essential functions of this work examples that I gave, the essential functions can be performed both sitting and standing, but it's going to go to the off task.  How much change are they doing, the postural change.  Are they using that cane while staying in a standing position at the workstation.  Is it taking away from the work product or the essential function of the job by using that one upper extremity for balance.

(*Id.* at 56.)

## III.  STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4)*,* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c),

416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).    Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since August 26, 2021, the application date (20 CFR 416.971 *et seq*.).

2.    The claimant has the following severe impairments: right lower extremity fractures; left ankle arthritis; acute myocardial infarctions; coronary artery disease, status-post stent placement and catheterization; and hyperlipidemia (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) with the following additional limitations: he can occasionally push/pull with the right lower extremity. He can never climb ladders, ropes, or scaffolds. He can occasionally stoop, knee, crouch, and climb ramps/stairs. He can occasionally balance as that term is defined in the Dictionary of Occupational Titles (DOT). He can never crouch or crawl. He must avoid concentrated exposure to humidity, vibrations, extreme heat/cold, and atmospheric conditions such as fumes, odors, dusts, gases, and poor ventilation. He must avoid

exposure to hazards, including unprotected heights, commercial driving, and heavy machinery. He also requires the use of a cane to aid in ambulation.

5.    The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.    The claimant was born on December **, 1976 and was 44 years old, which is defined as a younger individual age 45-49, on the date the application was filed (20 CFR 416.963).

7.    The claimant has at least a high school education (20 CFR 416.964).

8.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10.   The claimant has not been under a disability, as defined in the Social Security Act, since August 26, 2021, the date the application was filed (20 CFR 416.920(g)).

(Tr. 18-27.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility

determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the

14

Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.  RFC Challenge

In his second assignment of error, Hunt argues that the ALJ erred in analyzing the medical opinions and prior administrative medical findings in the record.  (Doc. No. 8 at 12.)  In addition, Hunt asserts the ALJ further erred in her subjective symptom analysis.  (*Id.*)  Finally, Hunt maintains that the ALJ failed to identify substantial evidence in support of the RFC.  (*Id.*)  The Court addresses each of these subclaims in turn.

#### 1.  Opinion Evidence

##### a.  Dr. Norris

Hunt challenges the ALJ's reasoning in finding the opinion of consulting examiner Dr. Norris vague and unpersuasive.  (*Id.* at 13.)  Hunt argues that "it is unclear how an ejection fraction in a certain range and other clinical findings regarding the ankle and foot support the abilities reflected in the RFC finding, and Dr. Norris' opinion does not support the abilities contained in the RFC finding."  (*Id.* at 14.)  Hunt maintains that the ALJ failed to build an accurate and logical bridge between the evidence and the RFC finding.  (*Id.*)  Hunt argues that the ALJ failed to explain how the clinical findings regarding Hunt's foot and ankle "support the ability to stand and walk for up to 2 hours out of an 8-hour workday, which is still required for sedentary work, . . . as opposed to standing and walking for no minutes, 30 minutes, 60 minutes, etc. out of an 8-hour workday."  (*Id.* at 15.)  Even though the RFC included greater walking and standing limitations than those opined by Dr. Norris, Hunt asserts that the decision is unclear as to "*why*

[Hunt's] impairments and symptoms would be expected to cause the assessed limitations and not additional or greater limitations." (*Id.*) (emphasis in original).

The Commissioner responds that the ALJ rejected Dr. Norris' opinion as vague because Dr. Norris "failed to quantify the 'other limitations' and because he did not explain how the quantified limitations were substantiated by the evidence." (Doc. No. 10 at 14.) In addition, the ALJ rejected Dr. Norris' opinion in part to credit Hunt's allegations and the medical evidence regarding his chronic conditions. (*Id.*) The Commissioner maintains that "it is unclear what harm Plaintiff is alleging from the ALJ's supposed error in evaluating Dr. Norris' opinion," as if the ALJ had found Dr. Norris' opinion fully persuasive, the ALJ would have imposed a less restrictive RFC. (*Id.*)

Since Hunt's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 416.920c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. § 416.920c(a). Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[3] (2) consistency;[4] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment

---

[3] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(1).
[4] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(2).

relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements.  20 C.F.R. § 416.920c(a), (c)(1)-(5).  However, supportability and consistency are the most important factors.  20 C.F.R. § 416.920c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions.  The new articulation requirements are as follows:

(1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

(2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

(3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

17

20 C.F.R. § 416.920c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. § 416.920c(a), (b)(1)).  A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

The ALJ analyzed Dr. Norris' opinion as follows:

> As for opinion evidence, the consultative examination said the claimant should be able to walk for 2 or 3 hours out of an 8-hour day. Dr. Norris said the claimant could probably be on his feet for a combined total of 3 hours out of an 8-hour day. He said the claimant probably could carry less than 30 pounds frequently and more than 40 pounds occasionally. Additionally, Dr. Norris said other functioning limitations include lifting, carrying, pushing, pulling, crawling, kneeling, crouching, climbing, stooping, and bending. The undersigned found this opinion unpersuasive, as it is vague, unclear, and non-policy compliant. While Dr. Norris provides some specific function- by-function limitations (with regard to standing, walking, and carrying), the remainder of his limitations provide no such analysis – that is, it does not specific how *much* the claimant lift, push, and pull, how *often* she can kneel, crouch, etc.).

> As such, it lessens the overall probative value of this opinion, as it such vagueness provides little assistance in determining the most the claimant can do despite her impairments. What is more, those limitations that do provide more specifics are not well supported, as he points to range of motion/decreased strength in the right leg and the claimant's history of heart attacks as his support for his functioning limitations but does not specific *which* limitations these address and *why* these impairments/symptoms would be expected to cause the assessed limitations (5F/8).

> Further, his opinion that the claimant can lift up to 40 pounds is inconsistent with the record, which clearly demonstrates a history of heart-related issues, including 3 heart attacks and stent place with associated shortness of breath with strenuous exertional activity, as well as well ongoing right leg/foot pain that, when considered as a whole, would make lifting/carrying that amount of weight difficulty, especially if the claimant must also carry an assistive

18

> device. While this opinion is unpersuasive, the undersigned notes that the limitations described therein, although vague, are account for the in the claimant's residual functional capacity. Additionally, the undersigned notes that subsequent evidence, including the treatment records in 12F showing ejection fraction percentages in the mid-20s supports greater limitations (12F/15).

(*Id.* at 24-25) (emphasis in original).

The ALJ considered the supportability and consistency of Dr. Norris' opinion as required by the regulations. (*Id.*) The ALJ credited Dr. Norris' opinion as to Hunt's ability to stand and/or walk for two to three hours by incorporating a restriction to standing and walking for two hours in the RFC. (*Id.* at 24.) However, the ALJ rejected Dr. Norris' opined limitations outside of standing, walking, and carrying as vague because they were not accompanied by an explanation of the limitations. (*Id.* at 24-25.) "Vagueness, or the failure to propose specific functional limitations, can be a reason to discount a medical opinion. *See Quisenberry v. Comm'r of Soc. Sec.*, 757 F. App'x 422, 434 (6th Cir. 2018)." *Springer v. Comm'r of Soc. Sec.*, Case No. 5:19 CV 2562, 2020 WL 9259707, at *9 (N.D. Ohio Oct. 8, 2020). Dr. Norris' opinion lacked specific functional limitations. Dr. Norris stated only that "Other limitations in function include lifting, carrying, pushing, crawling, kneeling, crouching, climbing, stooping, and bending." (Tr. 444.) This opinion "lack[s] the specificity required for the ALJ to determine 'the most [Plaintiff] can still do despite [Plaintiff's] limitations'. 20 C.F.R. § 416.945(a)(1). Therefore, the ALJ's assessment that the opinion was vague is not erroneous." *Springer*, 2020 WL 9259707, at *9.

In addition, the ALJ imposed more restrictive carrying limitations in the RFC than Dr. Norris opined, in part because of Hunt's heart condition and reduced ejection fraction. (Tr. 25.) It is the ALJ's job to weigh the evidence and resolve conflicts, and she did so here. While Hunt would weigh the evidence differently, it is not for the Court to do so on appeal.

b.      **State agency reviewing physicians**

Hunt argues that, while the ALJ found the opinions of the state agency reviewing physicians to be unpersuasive because of additional evidence presented at the hearing, including worsening heart-related examination findings and evidence showing the medical need for a cane, the ALJ "failed to build an accurate and logical bridge" between the evidence and the ALJ's findings regarding the use of a cane and leg elevation. (Doc. No. 8 at 20.) Hunt asserts that there is no evidence Hunt required a cane only for walking, and Hunt himself testified he needed the cane for walking and balance. (*Id.*) Hunt recites evidence from Dr. Lynn that he argues undermines the ALJ's findings. (*Id.*) Hunt maintains that the ALJ's findings were not tied to the record. (*Id.*) In addition, Hunt asserts the ALJ failed to address the need for leg elevation. (*Id.* at 20-21.)

The Commissioner responds that Hunt's argument is nothing more than an improper request for the Court to reweigh the evidence in his favor. (Doc. No. 10 at 17.) The ALJ "properly evaluated" the opinion evidence in the record and identified substantial evidence in support of her findings. (*Id.*) The Commissioner argues that the Court can trace the ALJ's reasoning on judicial review. (*Id.* at 18.) Therefore, the Court must affirm the ALJ's decision. (*Id.*)

In reply, Hunt argues that he testified to using a cane for both ambulation and balance, and the only reference to a cane in the medical records is for ambulation and balance. (Doc. No. 12 at 4-5.) Hunt argues that the "ALJ's contrary finding is not tied to any evidence in the record, including Plaintiff's testimony." (*Id.* at 5.) Hunt maintains he is not asking the Court to reweigh the evidence, but rather is asking the Court to remand the case for proper application of the appropriate legal standards. (*Id.*) Hunt argues the Commissioner fails to identify the substantial evidence that supports the ALJ's findings. (*Id.*)

The ALJ analyzed the state agency reviewing physicians' opinions as follows:

> The state level consultants limited the claimant to light work except the can could stand/walk for 2 hours in an 8-hour workday. He can occasionally

push/pull right lower leg. He can never climb ladders ropes, or scaffolds. He can occasionally climb ramps/stairs. He can occasionally balance and/or stoop, and frequently kneel, crouch, and crawl. He must avoid concentrated exposure to extreme cold, extreme hot, humidity, vibrations, atmospheric conditions - fumes, odors, dusts, gases, poor ventilation. He should avoid moderate exposure to hazards, including unprotected heights, commercial driving and heavy machinery (2A/4A). While the state level consultants supported their assessments with specific references to the medical and other evidence of record, (2A/4A), the claimant submitted additional treatment records at the hearing, including evidence showing worsening heart-related findings on diagnostic testing, which, in combination with the claimant's testimony and medical evidence show medical need for a cane, the evidence, when considered as a whole, supports further limitations than determined below. As such, these opinions are generally unnpersuasive.

(Tr. 25.)

Elsewhere in the RFC analysis, the ALJ found as follows:

While such evidence, when viewed in its entirety, fails to fully support the extent of limitation that the claimant alleges, the record certainly describes findings that would limit his overall work-related functioning ability and as such, the undersigned must include limitations in the claimant's residual functional capacity to account for them. As noted above, the claimant suffered significant right foot fracture, which required a period of non-weightbearing followed by surgical intervention and subsequent residual pain, gait disturbance, and swelling, causing difficulty with prolonged standing/walking.

This evidence, in combination with the claimant's left foot osteoarthritis, which likely reduces walking ability further, as well as the claimant's myocardial infarction history, his associated stent placement, and evidence of continued symptoms such pain/pressure and shortness of breath, supports limiting the claimant to sedentary work.

Sedentary work limits the claimant to standing/walking no more than two hours in an 8-hour workday, which accounts for evidence of foot/ankle pain, limited right foot/ankle ranger of motion, antalgic gait, ankle swelling, and the claimant's reported difficulty standing/walking for prolonged periods. Sedentary work also limits him to lifting/carrying to no more than 10 pounds, which accounts for and addresses the claimant's shortness of breath, which he said worsens with strenuous activities, as well as fatigue, right leg/foot pain, and lumbar tenderness.

To account for the claimant's residual ankle/foot pain, right leg pain, decreased right ankle, and decreased right ankle, foot, and knee strength, the undersigned limited the claimant included postural limitations and limited the claimant's pushing/pulling with the right lower extremity. Given evidence of

> stability and balance problems, the undersigned limited the claimant to occasionally balance, no climbing of ladders, ropes, or scaffolds, and no work at unprotected heights, commercial driving, and heavy machinery. To account for the claimant's heart-related shortness of breath, the undersigned included a limitation he avoids concentration to pulmonary irritants such dusts, fumes, gases, etc. Finally, the undersigned included a limitation that the claimant requires a cane when ambulating.

(*Id.* at 24.)

Hunt's argument regarding leg elevation is not well-taken, as Hunt failed to testify to the need for elevating his legs.  During the hearing, Hunt's attorney asked, "Do you do any ice, heat, leg elevation during the day, anything like that?"  (Tr. 45.)  Hunt testified:

> No.  I was told the whole ice thing was pretty no good as far as rehab too because I have to move out of going to rehab, which rehab for both of me is awkward because I can't do anything for my heart as far as rehab because I can't run on a treadmill.  You know, I can't be on an elliptical.  I can't do anything physically like that for, you know, my cardiac rehab.  And then for the foot rehab, he said since it's fused together, he didn't want anybody pushing and pulling on it because if they break the fusion, then we could have a real major problem.

(*Id.*)  Furthermore, the medical evidence cited by the parties regarding the need for leg elevation consisted of a period of 2-8 weeks in 2022 (*id.* at 512-15), and Hunt makes no argument that the medical need for leg elevation continued after that point.  (Doc. Nos. 8, 12.)

Regarding Hunt's use of a cane, the Court agrees that the ALJ failed to build a logical bridge between the evidence and her conclusions.  The ALJ acknowledged Hunt's testimony that he used a cane for both ambulation and walking (Tr. 21), but then without explanation found Hunt needed a cane for ambulation only and included that limitation in the RFC.  (*Id.* at 24.)  However, this error was harmless, for as the Commissioner points out, the VE testified that the use of a cane for balance would not impact the essential functions of the sedentary jobs identified at Step Five.[5]  (*Id.* at 53.)

---

[5] Hunt fails to respond to the Commissioner's harmless error argument.  (Doc. No. 12.)  In addition, Hunt makes no argument that the addition of the use of a cane for balance would increase his time off task. (*Id.*)

2. **Subjective Symptom Analysis**

Hunt argues that the ALJ's findings are inconsistent with Hunt's testimony, and the ALJ "failed to provide adequate reasons for rejecting [Hunt's] allegations of greater limitations."  (Doc. No. 8 at 16.) Hunt asserts the ALJ failed to *explain* how the evidence was inconsistent with Hunt's allegations, which limitations were unsupported, and why the evidence was inconsistent with those limitations.  (*Id.* at 18.) Hunt maintains that his testimony is inconsistent with the two hours of standing and walking "typically required for sedentary work," and his testimony regarding position changes is inconsistent with sedentary work and would support time off task.  (*Id.*)  Hunt argues that "[t]he ALJ's findings are premised on the unsupported and unexplained finding that Plaintiff would not require position changes and would not require time off task as a result of position changes."  (*Id.* at 19.)

The Commissioner responds that the ALJ considered Hunt's subjective complaints and found the record did not support those complaints to the extent alleged.  (Doc. No. 10 at 12-13.)

In reply, Hunt argues that the ALJ's recitation of the medical evidence is not sufficient to explain the ALJ's rejection of Hunt's subjective complaints, and the ALJ failed to explain why greater limitations were rejected.  (Doc. No. 12 at 5-6.)

When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  *See e.g., Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 921 (6th Cir. 2011).  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms.  Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how

[those] symptoms limit [the claimant's] capacity for work."  20 C.F.R. § 416.929(c)(1).  *See also* SSR 16-3p,[6] 2016 WL 1119029 (March 16, 2016).

If these claims are not substantiated by the medical record, the ALJ must make a credibility[7] determination of the individual's statements based on the entire case record. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ").  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  SSR 16-3p, 2016 WL 1119029; *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record.  *See* 20 C.F.R. §§ 404.1529, 416.929; SSR 16-3p, 2016 WL 1119029 (March 16, 2016).  Beyond medical evidence, there are seven factors that the ALJ

---

[6] SSR 16-3p superseded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016.  Thus, SSR 16-3 was in effect at the time of the August 25, 2023 hearing.

[7] SSR 16-3p has removed the term "credibility" from the analysis.  Rather, SSR 16-3p directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms," and "evaluate whether the statements are consistent with objective medical evidence and other evidence."  SSR 16-3p, 2016 WL 1119029, at *6.  The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.'"  *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016).

should consider.[8]  The ALJ need not analyze all seven factors but should show that he considered the relevant evidence.  *See Cross*, 373 F. Supp. 2d at 733; *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ acknowledged Hunt's testimony and other statements regarding his symptoms and limitations, including his use of an ankle brace and cane, difficulty standing and walking, standing for no more than 15 minutes, and sitting for more than 25 minutes.  (Tr. 21.)  The ALJ determined Hunt's medically determinable impairments could reasonably be expected to cause the alleged symptoms.  (*Id.*) However, the ALJ found his statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with medical evidence and other evidence in the record for the reasons set forth in the decision.  (*Id.*)  Specifically, the ALJ found as follows:

> At the hearing in August 2023, the claimant said that he is able to drive a vehicle and that he helps care for his grandmother with dementia, assisting with household chores, dishes laundry, etc. which suggests that the claimant engages in relatively normal activities of daily living despite his impairments (Hearing Testimony). He also said that the" only time [his heart] gets out of whack is when he is out in a function or...out in the heat," which suggest that if the claimant avoids these known triggers, his heart-related symptoms and episodes would decrease (Hearing Testimony).
>
> While such evidence, when viewed in its entirety, fails to fully support the extent of limitation that the claimant alleges, the record certainly describes findings that would limit his overall work-related functioning ability and as such, the undersigned must include limitations in the claimant's residual functional capacity to account for them. As noted above, the claimant suffered significant right foot fracture, which required a period of non-weightbearing

---

[8] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 16-3p, 2016 WL 1119029, at *7; *see also Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

> followed by surgical intervention and subsequent residual pain, gait disturbance, and swelling, causing difficulty with prolonged standing/walking.
>
> This evidence, in combination with the claimant's left foot osteoarthritis, which likely reduces walking ability further, as well as the claimant's myocardial infarction history, his associated stent placement, and evidence of continued symptoms such pain/pressure and shortness of breath, supports limiting the claimant to sedentary work.
>
> Sedentary work limits the claimant to standing/walking no more than two hours in an 8-hour workday, which accounts for evidence of foot/ankle pain, limited right foot/ankle ranger of motion, antalgic gait, ankle swelling, and the claimant's reported difficulty standing/walking for prolonged periods. Sedentary work also limits him to lifting/carrying to no more than 10 pounds, which accounts for and addresses the claimant's shortness of breath, which he said worsens with strenuous activities, as well as fatigue, right leg/foot pain, and lumbar tenderness.
>
> To account for the claimant's residual ankle/foot pain, right leg pain, decreased right ankle, and decreased right ankle, foot, and knee strength, the undersigned limited the claimant included postural limitations and limited the claimant's pushing/pulling with the right lower extremity. Given evidence of stability and balance problems, the undersigned limited the claimant to occasionally balance, no climbing of ladders, ropes, or scaffolds, and no work at unprotected heights, commercial driving, and heavy machinery. To account for the claimant's heart-related shortness of breath, the undersigned included a limitation he avoids concentration to pulmonary irritants such dusts, fumes, gases, etc. Finally, the undersigned included a limitation that the claimant requires a cane when ambulating.

(*Id.* at 24.)

The Court finds substantial evidence supports the ALJ's assessment of Hunt's subjective complaints. The record evidence, as noted by the ALJ, is not entirely consistent with Hunt's allegations of disabling conditions. (*Id.* at 21-25.) The ALJ credited some of Hunt's subjective symptoms but did not accept them to the extent alleged by Hunt because of findings on examinations, his own statements, and gaps in treatment, factors to be considered under the regulations. (*Id.*) The Court finds it is able to trace the path of the ALJ's reasoning regarding the subjective symptom evaluation in the decision. The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton*, 246 F.3d at 772-73.

**3.      Substantial Evidence in Support of the RFC**

Hunt argues that the ALJ "further erred when relying upon her lay opinion to form the RFC finding." (Doc. No. 8 at 14.)  Hunt asserts that "[t]he ALJ failed to identify a medical expert interpretation of the evidence into function terms, and the resulting findings are unsupported by substantial evidence." (*Id.*)  Hunt maintains that the ALJ failed to identify substantial evidence supporting the RFC.  (*Id.* at 15.)  Hunt argues that the ALJ's "lay interpretation of the evidence" is inconsistent with the medical opinions in the record and Hunt's testimony.  (*Id.* at 19.)

The Commissioner responds that "the ALJ did not interpret raw medical data."  (Doc. No. 10 at 14.)  The Commissioner argues that the Sixth Circuit has defined raw medical data as "a narrow category of evidence that does not include either (1) medical signs or (2) laboratory testing that has been read by a competent medical professional."  (*Id.* at 15) (citing *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 726 (6th Cir. 2013); *Sallaz v. Comm'r of Soc. Sec.*, No. 23-3825, 2024 WL 2955645, at *8 (6th Cir. June 12, 2024)).  To the extent Hunt argues the ALJ was "required to have a specific *medical opinion* interpreting the medical signs and laboratory opinions," the Commissioner argues that this proposition of law has been rejected by the Sixth Circuit.  (Doc. No. 10 at 15) (emphasis in original).

As the Commissioner states, "the ALJ was not required to obtain a medical expert to interpret the medical evidence related to [Hunt's] impairments."  *Rudd*, 531 F. App'x at 727.  "In fact, the regulations require the ALJ to evaluate the medical evidence to determine whether a claimant is disabled."  *Id.* at 726.  Nor did the ALJ interpret "raw medical data beyond her ability," as the ejection fraction data, as well as the clinical findings regarding Hunt's foot and ankle, had been reviewed and interpreted by medical professionals.  *See id.* at 727.  In addition, the ALJ relied on the ejection fraction data to impose a more restrictive lifting requirement than Dr. Norris opined.

To the extent Hunt argues that the ALJ erred in failing to rely upon a medical opinion on interpreting the evidence into functional terms, the Sixth Circuit has specifically rejected such an argument, finding "the Commissioner has final responsibility for determining an individual's RFC . . . and to require the ALJ to base her RFC finding on a physician's opinion 'would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.'" *Id.* at 728. *See also Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. Apr. 30, 2018) ("We have previously rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ."); *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442-443 (6th Cir. Sept. 26, 2017)); *Barnett v. Comm'r of Soc. Sec.*, Case No. 3:23 CV 749, 2024 WL 1596286, at *3 (N.D. Ohio Apr. 12, 2024) ("And, as Judge Grimes points out, it is not binding law. (Doc. 11, at 40) (quoting *Henderson v. Comm'r of Soc. Sec.*, 2010 WL 750222, at *2 (N.D. Ohio) ('The Court finds, however, that *Deskin* ... is not representative of the law established by the legislature, and interpreted by the Sixth Circuit Court of Appeals.')).""); *Carr v. Comm'r of Soc. Sec.*, Case No. 5:23-CV-00187-BMB, 2024 WL 1556398, at *11 (N.D. Ohio Jan. 8, 2024) ("A review of Sixth Circuit caselaw supports a finding that *Deskin* is not consistent with governing precedent.") (collecting cases), *report and recommendation adopted by* 2024 WL 1343473, at *5 (N.D. Ohio Mar. 30, 2024) ("District courts in this circuit have declined to follow *Deskin* and *Kizys. See e.g.*, *Adams v. Colvin*, No. 1:14-cv-2097, 2015 WL 4661512, at *15 (N.D. Ohio Aug. 5, 2015) (collecting cases); *Williams v. Astrue*, No. 1:11-cv-2569, 2012 WL 3586962, at *7 (N.D. Ohio Aug. 20, 2012); *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010). So, too, does this Court.").

**B.      VE Testimony**

In his first assignment of error, Hunt argues that the ALJ erred in relying on testimony from the VE that conflicted with the RFC.  (Doc. No. 8 at 9.)  Hunt asserts that the VE testified that the identified jobs would "require a greater amount of time seated than required for sedentary work."  (*Id.*)  Hunt maintains:

> If Plaintiff required sitting for 8 hours of an 8-hour workday, then this is more sitting than required for sedentary work, and the occupations identified by the VE are inconsistent with the Dictionary of Occupational Titles (DOT). The VE identified a conflict between his testimony and the DOT, and the ALJ was required to follow SSR 00-4p before relying upon the testimony. Cf. Medina v. Comm'r of Soc. Sec. Admin., 2014 WL 4748496, *16 (N.D. Ohio Sept. 23, 2014) ("Where the vocational expert does not identify any conflict between her testimony and the information provided in the DOT, the ALJ 'has no responsibility to identify or resolve a conflict that is not otherwise apparent'" (quoting Pena v. Commissioner, 2008 WL 3200253, *5 (N.D.Ohio Aug.4, 2008))). Given that the testimony patently consistent [sic] with the DOT and was elicited at the hearing, there is no waiver of Plaintiff's current argument. Cf. Aalijah W. v. Comm'r of Soc. Sec., 2024 WL 1714484, *11 (S.D. Ohio Apr. 22, 2024), report and recommendation adopted, 2024 WL 2315290 (S.D. Ohio May 22, 2024).

(*Id.* at 10.)  Hunt argues that the ALJ's catch-all question about the consistency of the VE's testimony with the DOT preceded the VE's subsequent testimony about sitting for eight hours in an eight-hour workday, and the ALJ "failed to clarify at the end of the cross examination whether the additional testimony was consistent with DOT and companion publications."  (*Id.* at 10-11.)  Therefore, Hunt maintains, the ALJ failed to comply with SSR 00-4p and failed to meet the Commissioner's burden at Step Five.  (*Id.* at 11.)

The Commissioner responds that Hunt's argument fails as it is "premised on an incomplete reading of the vocational expert's testimony."  (Doc. No. 10 at 10.)  The Commissioner argues:

> Here, the ALJ asked the vocational expert whether his testimony was consistent with the Dictionary of Occupational Titles and its companion publications, to which the expert responded in the affirmative (Tr. 54). And, while it is true that the ALJ found that Plaintiff was limited to sedentary work (Tr. 20) and the vocational expert testified that the representative occupations

he identified were typically performed while seated (Tr. 55), the vocational expert further explained that the "essential functions" of the identified occupations "can be performed both sitting and standing" (Tr. 56). There is no apparent conflict between a finding that Plaintiff was limited to sedentary work and the conclusion that he could perform the identified occupations, the essential functions of which could be performed in either sitting or standing positions. The ALJ satisfied his duty under SSR 00-4p and there is no unresolved conflict between the RFC and the vocational expert's testimony.

(*Id.* at 10-11.)

In reply, Hunt argues that the testimony the Commissioner cites regarding the essential functions of the identified jobs "was regarding the use of the cane and the frequency of position changes."  (Doc. No. 12 at 3.)  Hunt asserts that "[t]he testimony is unclear whether the occupations require 6 hours of sitting, as generally required for sedentary work, require 8 hours of sitting, as testified in response to cross examination, or less than 6 hours of sitting, which would be implied with position changes."  (*Id.*)  Hunt maintains that the Commissioner "fails to acknowledge the internal inconsistency in the vocational expert's testimony, and, in addition to failing to meet the Commissioner's burden at step five, the ALJ failed to comply with SSR 00-4p."  (*Id.*)

At Step Five of the sequential disability evaluation, the Commissioner bears the burden in proving work exists in the national economy that a claimant can perform.  "Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications."  20 C.F.R. § 416.966(b).  ALJs "will take administrative notice of 'reliable job information' available from various publications, including the DOT."  SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000).  In addition, as set forth in 20 C.F.R. § 416.966(e), ALJs may use VEs "as sources of occupational evidence in certain cases."  (*Id.*)  "When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled."  (*Id.*)  At the

hearing level, the ALJ must inquire on the record "as to whether or not there is such inconsistency."  (*Id.*)  Further, no one source "automatically 'trumps' when there is a conflict."  (*Id.*)  Rather, the ALJ "must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information."  (*Id.*)

The Court agrees that Hunt misconstrues the VE's testimony.  While Hunt is correct that the VE's testimony regarding the essential functions of the identified jobs was in part in response to the addition of a cane with walking, the VE's testimony in response to questions from the ALJ was not so narrow.  Nor was the VE's testimony in response to a question from counsel.  A review of the hearing transcript reveals the following exchange between the ALJ and the VE:

> Q   If [sic] a second hypothetical, please assume the same limitations as hypothetical number one.  However, the individual would be further reduced to the sedentary exertional level.  Additionally, the individual would be able to perform – or could never climb, that includes ladders, ropes, scaffolds, ramps and stairs.  The individual could not crawl.  And as opposed to frequent, the individual could only occasionally be able to crouch as well.  The individual would also require the use of the cane to aid in ambulation.  In light of these additional limitations, would the jobs that you identified in hypothetical one still be available?
>
> A   Yes, Your Honor.  The essential functions would be able to be performed with those parameters of that second hypothetical in a competitive nature of those sedentary alternative working numbers that I gave.
>
> Q   Thank you.  For the third hypothetical, please assume the same limitations as hypothetical number two.  However, in addition to the requirement that the individual would need to use a cane to aid in ambulation, the individual would also need to use the cane to aid in balancing.  What affect, if any, would that have on the jobs you had in hypotheticals one and two?
>
> A   Your Honor, the use of balance, again, those are sedentary work examples where the essential functions are performed in one postural position and so the use of the cane for balance is not going to impact those essential functions.  It's going to go to the off task, how much off task the individual has in changing his postural positions.  The sit/stand variance is not addressed in the <u>DOT</u> or the <u>SCO</u>, so it's going to be based on how much off task the individual is in this postural positions [sic] while performing those essential functions of those work examples that I gave.

31

(Tr. 52-53.)

After additional questioning, the ALJ then asked the VE whether, other than what the VE testified was based on his experience, the VE's testimony was consistent with the DOT and companion publications.  (*Id.* at 54.)  The VE testified that it was.  (*Id.*)  The ALJ then turned questioning of the VE over to Hunt's counsel.  (*Id.* at 55.)  A review of the hearing transcript reveals the following exchange between counsel and the VE:

> Q  Okay.  And the jobs you identified, right, those are jobs that the individual can sit.  Typically they're sitting eight hours a day doing their job?
>
> A  Yes, that's correct.
>
> Q  So when the Judge was talking about the cane for balance and ambulation both, they would basically not – they would need some sort of sit/stand option at the workforce for it to become work preclusive?  Am I correct on that?
>
> A  Well, the sit/stand variance is not addressed in the <u>DOT</u> or the <u>SCO</u>.  Based on my experience in the labor market, the essential functions of this work examples [sic] that I gave, the essential functions can be performed both sitting and standing, but it's going to go to the off task.  How much change are they doing, the postural change.  Are they using that cane while staying in a standing position at the workstation.  Is it taking away from the work product or the essential function of the job by using that one upper extremity for balance.
>
> Q  All right.
>
> A  And so it's going to go again to the off task threshold, which is ten percent off task.

(*Id.* at 55-56.)

The VE testified that the essential functions of the identified jobs could be performed sitting or standing, with use of a cane and a sit/stand option only going to the amount of time off task and not the essential functions of the jobs identified.  As explained in detail above, the ALJ credited some of Hunt's subjective symptom allegations, including his ability to sit, stand, and walk, but not to the extent alleged. And by not including any time off task in the RFC and the non-disability finding, especially when reading

the opinion as a whole, it is clear the ALJ disagreed that Hunt's position changes would take him off task to an amount that was work-preclusive.  A perfect opinion is not required.  *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.") (citations omitted); *see also NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 766 n.6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) (when "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game.").

The ALJ asked the VE about the consistency of his testimony with the DOT, and the VE himself identified instances where his testimony dealt with an issue not addressed by the DOT.  Again, it is the ALJ's job to weigh the evidence and resolve conflicts, and she did so here.  While Hunt would weigh the evidence differently, it is not for the Court to do so on appeal.

There is no error.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: May 6, 2025                          *s/ Jonathan Greenberg*
                                            Jonathan D. Greenberg
                                            United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**